UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
CHICAGO DIVISION

| | |
|---|---|
| CHRIS LEIBLE,<br><br>              Plaintiff,<br><br>  -against-<br><br>HILL-ROM HOLDINGS INC., JOHN P. GROETELAARS, WILLIAM G. DEMPSEY, GARY L. ELLIS, STACY ENXING SENG, MARY GARRETT, JAMES R. GIERTZ, WILLIAM KUCHEMAN, GREGORY J. MOORE, FECLICIA F. NORWOOD, and NANCY M. SCHLICHTING,<br><br>              Defendants. | Case No.: 21-cv-5681<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Chris Leible ("Plaintiff"), by the undersigned attorneys, for this complaint against Defendants, alleges upon personal knowledge with respect to Plaintiff, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This is an action brought by Plaintiff against Hill-Rom Holdings, Inc. ("Hillrom" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Hillrom, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed merger (the "Proposed Transaction") of Hillrom by and among Baxter

International Inc. ("Baxter") and Bel Air Subsidiary, Inc. ("Merger Sub").

2.      On or about September 2, 2021, Hillrom and Baxter announced an agreement and plan of merger, pursuant to which Hillrom would merge with and into affiliates of Baxter (the "Merger Agreement").  Pursuant to the terms of the Merger Agreement, Hillrom's shareholders would be entitled to receive $156.00 per share in cash for each share of Hillrom common stock they owned (the "Merger Consideration").

3.      On or about October 20, 2021, in order to convince Hillrom's public common stockholders to vote in favor of the merger, the Defendants authorized the filing of a materially incomplete and misleading Schedule 14(a) Definitive Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC").

4.      In particular, the Proxy contains materially incomplete and misleading information concerning the background of the Proposed Transaction and the valuation analyses performed by Hillrom's financial advisors, Goldman Sachs & Co. LLC ("Goldman Sachs") and BofA Securities, Inc. ("BofA Securities," and together with Goldman Sachs, the "Financial Advisors") regarding the Proposed Transaction.

5.      The Proposed Transaction is expected to close in early 2022 and the special meeting of the Company's shareholders to vote on the Proposed Transaction is scheduled for December 2, 2021.  Therefore, it is imperative that the material information that has been omitted from the Proxy is disclosed prior to the special meeting, so Plaintiff can properly exercise all corporate voting rights.

6.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed

Transaction unless and until the material information discussed below is disclosed to Hillrom's public common shareholders sufficiently in advance of the upcoming shareholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

8. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

9. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.

## PARTIES

10. Plaintiff is, and has been continuously throughout all times relevant hereto, the

owner of Hillrom common stock.

11.     Defendant Hillrom is an Indiana corporation with its principal executive offices located at 130 East Randolph Street, Suite 1000, Chicago, Illinois 60601.  The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "HRC."

12.     Defendant John P. Groetelaars ("Groetelaars") is, and has been at all relevant times, the Company's President and Chief Executive Officer, and a director of the Company.

13.     Defendant William G. Dempsey ("Dempsey") is, and has been at all relevant times, the Chair of the Board of Directors of the Company.

14.     Defendant Gary L. Ellis ("Ellis") is, and has been at all relevant times, a director of the Company.

15.     Defendant Stacy Enxing Seng ("Enxing Seng") is, and has been at all relevant times, a director of the Company.

16.     Defendant Mary Garrett ("Garrett") is, and has been at all relevant times, a director of the Company.

17.     Defendant James R. Giertz ("Giertz") is, and has been at all relevant times, a director of the Company.

18.     Defendant William Kucheman ("Kucheman") is, and has been at all relevant times, a director of the Company.

19.     Defendant Gregory J. Moore ("Moore") is, and has been at all relevant times, a director of the Company.

20.     Defendant Felicia F. Norwood ("Norwood") is, and has been at all relevant times, a director of the Company.

21.     Defendant Nancy M. Schlichting ("Schlichting") is, and has been at all relevant times, a director of the Company.

22.     The Defendants identified in paragraphs 12 through 21 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

23.     Hillrom is a publicly traded Indiana corporation that is a global medical technology leader employing approximately 10,000 people whose innovations affect more than 7 million patients each day, helping enable earlier diagnosis and treatment, optimize surgical efficiency, and accelerate patient recovery while simplifying clinical communication and shifting care closer to home.  Hillrom's innovations help deliver actionable, real-time insights at the point of care through digital and connected care solutions and collaboration tools, including smart bed systems, patient monitoring and diagnostic technologies, respiratory health devices, advanced equipment for the surgical space.  Hillrom's common stock trades on the NYSE under the ticker symbol "HRC."

24.     Prior to the announcement of the Proposed Transaction, Hillrom had excellent growth prospects.  Indeed, on July 30, 2021, just a month before the Proposed Transaction was announced, Hillrom issued a press release entitled *Hillrom Reports Fiscal Third Quarter Financial Results that Exceed Guidance and Raises Fiscal 2021 Guidance* announcing that Hillrom was continuing to execute on its strategic objectives, stating in part:

> "Our dedicated, global team continues to support customers' evolving needs and we remain encouraged by the building momentum and recovery in our underlying business.  This resulted in third quarter financial performance that exceeded expectations, illustrating the benefits of Hillrom's accelerated transformation, the resiliency of our portfolio, and our ongoing commitment to Advancing Connected Care™," said John Groetelaars, Hillrom president and CEO.  "As we look forward, we remain committed to driving sustainable and

profitable growth, achieving our strategic objectives, and unlocking significant value for patients, caregivers and shareholders as we deliver on our mission."

25.     Thus, the Proposed Transaction was negotiated and announced while Hillrom's future success was not fully reflected by its share price.  As a result, the Proposed Transaction will "compensate" the Company's stockholders with cash that fails to adequately compensate them for the intrinsic value of their shares.

26.     Despite Hillrom's intrinsic value and growth prospects, the Individual Defendants are agreeing to a merger that cashes out the Company's stockholders and deprives them the ability to partake in the Company's growth.  The Individual Defendants breached their fiduciary duties owed to the Company's stockholders by agreeing to the Proposed Transaction for the unfair Merger Consideration and allowing the unfair and flawed sales process to unfold in the manner that it did, which will cause Plaintiff and the Class to receive an inadequate Merger Consideration.

**The Proposed Transaction**

27.     On September 2, 2021, Hillrom and Baxter issued a press release announcing the Merger Agreement, stating in part:

### BAXTER TO ACQUIRE HILLROM, EXPANDING CONNECTED CARE AND MEDICAL INNOVATION GLOBALLY

*Transaction valued at $156.00 per Hillrom Share for an All-Cash Purchase Price of $10.5 Billion*

- *Brings together two leading medical technology companies to broaden access to care in the hospital, home and alternate site settings*

- *Accelerates digitally-enabled connected care solutions across the continuum of care*

- *Builds on Baxter's global footprint to expand Hillrom's penetration of international markets*

- *Creates significant opportunities to position Baxter for faster top-and bottom-*

*line growth*

- *Expected to generate high single-digit ROIC by year five*

September 2, 2021

DEERFIELD, Ill. & CHICAGO—(BUSINESS WIRE)—Baxter International Inc. (NYSE: BAX), a leading global medical products company, and Hillrom (NYSE: HRC), a global medical technology leader, today announced that the companies have entered into a definitive agreement under which Baxter has agreed to acquire Hillrom for $156.00 per share in cash for a total equity value of approximately $10.5 billion and a total enterprise value of approximately $12.4 billion, including the assumption of debt.

Hillrom brings a highly complementary product portfolio and innovation pipeline that will enable Baxter to provide a broader array of medical products and services to patients and clinicians across the care continuum and around the world, facilitating the delivery of healthcare that is patient- and customer-centered and focused on improving clinical outcomes. The combination is also expected to accelerate the companies' expansion into digital and connected care solutions that are increasingly enabling patients with access to hospital-level care at home or in other care settings.

"Baxter and Hillrom share a common vision for transforming healthcare to better serve all patients and providers," said José (Joe) E. Almeida, Baxter's chairman, president and chief executive officer. "Patients increasingly want to receive their care at home or nearby, while hospitals and other care providers are increasingly using digital health technologies to expand access, improve quality and lower costs. Baxter and Hillrom are uniting to meet the challenges of a rapidly evolving global healthcare landscape, while also creating significant value for all the stakeholders we serve. We're very excited to welcome the Hillrom team to Baxter, and to join together to advance our mission to save and sustain lives."

John Groetelaars, Hillrom's president and chief executive officer, said, "We are proud of the steps we have taken to transform Hillrom into a medical technology leader with an innovative portfolio of connected care solutions. Today's milestone announcement represents a win-win for all stakeholders. Patients and caregivers will benefit from enhanced capabilities across the continuum of care, our shareholders will receive a significant and immediate premium for their investment, and our employees will benefit from being part of a larger, stronger company with accelerated growth opportunities. Baxter is the ideal partner to enhance our global reach and realize the true potential of our vision to accelerate medical innovation around the world. With our shared patient-centric cultures, we look forward to seamlessly bringing our two companies together."

Strategic Rationale

The Baxter-Hillrom combination will expand access to Hillrom's portfolio globally; broaden the presence of the combined companies across sites of care; accelerate and strengthen the combined organization's digital transformation; and is expected to generate compelling financial returns for Baxter's shareholders.

Key benefits of the acquisition include:

- *A common vision for transforming healthcare to improve efficiencies and clinical outcomes, dirve actionable insights and lead across the care continuum:*

  The complementary product offering of the combined companies will support the patient in the hospital, at home, and in alternate sites of care, allowing better integration and coordination of healthcare delivery.

- *A strengthened portfolio with opportunity to accelerate digitally-enabled connected healthcare and expand penetration of combined solutions worldwide:*

  The companies' combined capabilities in therapeutic delivery, monitoring, blood purification, diagnostics and communications for patients and caregivers will enhance opportunities for truly connected care that result in better patient outcomes, improved workflow efficiencies and data-driven insights while lowering healthcare costs overall.

- *A robust combined platform for shareholder value creation through meaningful anticipated synergies with a continued commitment to strong cash flow generation:*

  The transaction provides a significant opportunity to build upon Baxter's established global infrastructure to grow Hillrom's international business, which currently represents approximately one-third of Hillrom's total 2020 revenue. It should also meaningfully enhance Baxter's earnings growth through the realization of substantial cost synergies and potential opportunities to accelerate revenue growth over the longer term.

- *A shared culture that values inclusivity, innovation and corporate responsibility:*

  The combination unites two organizations that have each been recognized for achievements in workplace diversity and corporate responsibility, and for fostering an environment that supports and encourages high performance, respect for individuals, and professional growth.

Transaction Highlights

Upon completion of the transaction, Baxter will pay $156.00 in cash for each outstanding share of Hillrom common stock for a purchase price of $10.5 billion. Baxter will also assume Hillrom's outstanding debt and cash, for a total enterprise

value of $12.4 billion. The purchase price represents a 26% premium to Hillrom's closing stock price on July 27, 2021, the last trading day prior to media reports speculating about a potential transaction.

Baxter expects the combination to result in approximately $250 million of annual pre-tax cost synergies by the end of year three. This estimate excludes any benefit from potential new revenue growth opportunities resulting from the combination of the two organizations.

The transaction is expected to be low double-digit accretive to Baxter's adjusted earnings per share (EPS) in the first full year post close, increasing to more than 20% by year three. The transaction is also expected to expand Baxter's overall adjusted EBITDA margins over the medium-term and deliver strong cash flow generation with a high single-digit return on invested capital (ROIC) expected by year five.

Baxter will finance the transaction through a combination of cash and fully committed debt financing. At closing, Baxter estimates that it will have net leverage of approximately 4.2x net debt to pro forma[1] adjusted EBITDA of the combined companies (as estimated by Baxter management). Baxter is committed to an investment grade credit rating and deleveraging to 2.75x net leverage within two years of closing.

Approvals and Timing

The Boards of Directors of both companies have unanimously approved the acquisition. The transaction is subject to the approval of Hillrom shareholders and the satisfaction of customary closing conditions, including regulatory approvals. The transaction is expected to close by early 2022.

Baxter Long-term Financial Guidance and 2021 Investor Conference Update

As a result of the proposed acquisition, Baxter's 2021 Investor Conference, originally scheduled for Sept. 20, will be rescheduled to a date following the transaction's completion. This will allow Baxter to provide an updated strategic and financial outlook inclusive of the combined organizations.

In the interim, Baxter is issuing long-term financial guidance as a standalone entity. Baxter expects sales to grow 4-5%, compounded annually from 2021 to 2024 based on current foreign exchange rates. Over this period, Baxter anticipates expanding its adjusted operating margin by 300 basis points or more. On an adjusted basis, Baxter expects to deliver earnings growth of low double digits compounded annually over the same period. This Baxter standalone guidance does not reflect any impact from the proposed acquisition.

Advisors

Perella Weinberg Partners LP is acting as lead financial advisor to Baxter. J.P. Morgan and Citi are also serving as financial advisors to Baxter and have

committed to provide fully committed financing. Sullivan & Cromwell LLP is serving as legal advisor to Baxter. Goldman, Sachs & Co. LLC is serving as lead financial advisor and BofA Securities is serving as financial advisor to Hillrom. Wachtell, Lipton, Rosen & Katz is serving as legal advisor to Hillrom.

**The Preclusive Deal Protection Devices**

28.     To the detriment of the Company's shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

29.     The Merger Agreement is protected by "no-shop" provisions that prohibit, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative acquisitions or business combinations.

30.     The Merger Agreement also contains "information rights" provisions, which require the Board to provide Baxter with written notice of any Acquisition Proposal and further require the Board to provide prior written notice of its intention to terminate the Merger Agreement in favor of any Superior Proposal and negotiate with Baxter following receipt of the notice, so that Baxter has the opportunity to adjust the terms and conditions of the Merger Agreement so that the Acquisition Proposal ceases to be a Superior Proposal.

31.     In addition, the Merger Agreement provides that the Company will be required to pay a termination fee of $367,000,000.00 with respect to any termination under the no-shop provision.

32.     Ultimately, these preclusive deal protection devices restrained and continue to restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The aggregate effect of these preclusive deal protection devices, viewed in light of the materially inadequate consideration

offered for the Company's shares in the Proposed Transaction and the flawed and conflicted negotiations process, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

33.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**The Proxy Omits Material Information**

34.     On or about October 20, 2021, in order to convince the Company's public common shareholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of the materially incomplete and misleading Proxy with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

35.     Specifically, the Proxy omits two types of material information: (i) information regarding the background of the Proposed Transaction; and (ii) financial information that renders the Financial Advisors' fairness analysis materially false, misleading, or incomplete.

    **A.     The Proxy Omits Material Information Regarding the Background of the Proposed Transaction**

36.     The Proxy fails to provide material information regarding the background of the merger that implicates the possibility that the Merger Consideration is inadequate.

37.     The Proxy fails to disclose whether Defendants knew the identity of the source(s) for the July 28, 2021 and August 29, 2021 articles reporting market rumors about a potential transaction between Hillrom and Baxter, and, if so, whether the source was acting at the instruction of Hillrom or Baxter. This information is especially material to the Company's public shareholders because the Board considered the existence of these rumors in electing not to engage in any outreach to potential counterparties prior to executing the Merger Agreement.

38.     The Proxy fails to disclose when Defendants determined to retain BofA Securities as an additional financial advisor, Defendants' reasons for doing so, and when BofA Securities disclosed potential conflicts of interest respecting Baxter.

39.     The Proxy fails to disclose whether the discussions regarding "the ability of Hillrom to consider alternative proposals prior to shareholder approval of the transaction, and under certain circumstances, terminate any definitive agreement with Baxter to enter into a superior proposal" were discussions of a standard "fiduciary out" provision or were discussions about a go-shop or window-shop provision pursuant to which the Board would have had an actual post-signing opportunity to engage in effective outreach to potential counterparties.

**B.      The Proxy Omits Material Financial Information that Renders the Company's Financial Advisors' Fairness Analysis Materially Misleading**

40.     The Proxy also omits material information that renders the Financial Advisors' Fairness Analysis materially misleading.

41.     The Proxy describes the Fairness Opinion and the various valuation analyses that the Financial Advisors performed to render its opinion but fails to provide enough information regarding the necessary data, support for conclusions, or the existence of, or basis for, the underlying assumptions that underpin the fairness opinion.  Specifically, the Proxy does not disclose enough information regarding the financial projections, inputs, and assumptions for various financial valuations.  Without this information, stockholders cannot replicate the analyses, confirm the valuations, evaluate the Financial Advisors' opinion that the Merger Consideration is fair, or accurately assess the reliability of the Fairness Opinion.  The informative value of the Fairness Opinion is not in its conclusions, but in the valuation analyses that support them.  Thus, the key inputs, which are intrinsically baked into those conclusions, must also be fairly disclosed.

42.     With respect to the Management Projections, the Proxy fails to disclose certain line-

items, including (i) Interest, (ii) Taxes (or tax rate), (iii) Depreciation and amortization, (iv) Field corrective actions, (v) Regulatory compliance costs, (vi) Special charges, (vii) Acquisition and integration costs and related fair value adjustments, (viii) Acquisition-related intangible asset amortization, (ix) Capital expenditures, (x) Changes in net working capital, and (xi) Tax shield attributable to acquisition related asset amortization.

43.     By providing the limited summary in the Proxy and withholding the omitted information, Defendants render the Management Projections in the Proxy materially incomplete and provide a misleading valuation picture of the Company.  With respect to financial projections, directors are obligated to provide complete valuation metrics to shareholders, particularly in cash-out transactions where non-GAAP metrics were used by the banker, since such metrics are not uniformly defined and shareholders are therefore unable to assess the utility and legitimacy of the actual metrics without seeing the underlying components.

44.     With respect to Goldman Sachs' *Discounted Cash Flow Analysis* beginning on Page 36, the Proxy fails to: (i) fully disclose the rationale and basis for selecting a discount rate range of 7.5% to 8.5%, (ii) fully disclose the terminal values and rationale and basis for applying a range of perpetuity growth rates of 1.0% to 2.0%, and (iii) provide a sensitivity table that presents the derived enterprise values across the full range of discount rates and exit multiples.  This information is especially material to the Company's public shareholders as Goldman Sachs' selected perpetuity growth rate range effectively assumed zero (or possibly even negative) growth relative to inflation.  *See Merion Capital L.P. v. Lender Processing Servs.*, C.A. No. 9320-VCL, 2016 Del. Ch. LEXIS 189, at *73 (Del. Ch. 2016) (selecting perpetuity growth rate of 3.4% as reasonable for a mature firm with "declining prospects" because it was between inflation and nominal GDP and explaining: "This Court often selects a perpetuity growth rate based on a

reasonable premium to inflation.").

45.     This information is material to the Company's shareholders, and the omission of this information renders the summary of the *Discounted Cash Flow Analysis* incomplete and misleading.  As one highly-respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…"  *Id.*  As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value.  For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars*….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices**.* The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added).  Without the above-mentioned information, the Company's shareholders cannot: (i) evaluate for themselves the reliability of the *Discounted Cash Flow Analysis*, (ii) make a meaningful determination of whether the implied equity value ranges properly value the Company or were the result of an unreasonable judgment by the Financial Advisors, or (iii) make an informed decision regarding whether to vote in favor of the Proposed Transaction.

46.     With respect to Goldman Sachs' *Illustrative Present Value of Future Share Price Analysis* beginning on Page 37, the Proxy fails to: (i) fully disclose the rationale and basis for selecting a discount rate of 7.9%, and (ii) fully disclose Goldman Sachs' rationale and basis for valuing the Company based on a range of Enterprise Value to Forward Adjusted EBITDA

multiples of 13.0x to 15.0x. This information is especially material to the Company's public shareholders as Goldman Sachs' selected multiples appear to significantly undervalue the Company even relative to the multiples based on the Company's unaffected trading price.

47. With respect to Goldman Sachs' *Selected Transactions Analysis* beginning on Page 38, the Proxy fails to disclose: (i) whether each transaction involved cash consideration, stock consideration, or a cash-stock mix, (ii) the enterprise value for each of the selected companies, and (iii) the full rationale and basis for applying a range of Last Twelve Months Adjusted EBITDA multiples of 14.1x to 21.2x.

48. With respect to BofA Securites' *Selected Publicly Traded Companies Analysis* beginning on Page 41, the Proxy fails to disclose: (i) the underlying metrics and individual multiples for each of the selected companies, and (ii) the full rationale and basis for applying the selected reference multiples.

49. With respect to BofA Securities' *Selected Precedent Transactions Analysis* beginning on Page 42, the Proxy fails to disclose: (i) whether each transaction involved cash consideration, stock consideration, or a cash-stock mix, (ii) the individual multiples and enterprise value for each of the selected companies, and (iii) the full rationale and basis for applying the selected reference multiples.

50. With respect to BofA Securities' *Discounted Cash Flow Analysis* beginning on Page 43, the Proxy fails to: (i) fully disclose the rationale and basis for selecting a discount rate range of 7.0% to 9.0%, (ii) fully disclose the terminal values and rationale and basis for applying a range of terminal EBITDA multiples of 10.x to 15.0x, and (iii) provide a sensitivity table that presents the derived enterprise values across the full range of discount rates and exit multiples. As with Goldman Sachs' analyses, the disclosure of the rationale underlying the terminal value

calculations is especially material because it appears that BofA Securities' selected terminal multiples (which roughly correspond to the perpetuity growth rates selected by Goldman Sachs) effectively assume zero (or negative) growth relative to inflation. *Merion Capital*, 2016 Del. Ch. LEXIS 189, at *73.

51. Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all one's cards on the table face-up. In this case only some of the cards were exposed—the others were concealed. If a Proxy discloses financial projections and valuation information, such projections and valuations must be complete, accurate, and honest. The question is not simply whether there is a duty to speak, but also whether there may be liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. *See Campbell v. Transgenomic, et al.*, No. 18-2198 (8th Cir., March 1, 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases). Accordingly, Defendants have disclosed some of the information related to the projections, assumptions, and inputs relied upon by Defendants' financial advisors, but have omitted crucial line items, reconciliations, and other information. Thus, Defendants' omission renders the projections and summaries disclosed in the Proxy misleadingly incomplete.

52. In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote his shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

53.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

54.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

55.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

56.     The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

57.     Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding the valuation analyses performed by the Company's Financial Advisors in support of its fairness opinion.

58.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

59.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that the Company's Financial Advisors reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by the Company's Financial Advisors, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to, separately, review the Company's Financial Advisors' analyses in connection with their receipt of the fairness opinions, question the Company's Financial Advisors as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the

Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

60.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.   The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

61.     The Company is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

62.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

63.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

64.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as

officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

65.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

66.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.   The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

67.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

68.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

69.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

70.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: October 25, 2021    **ADEMI LLP**

           By: */s/ John D. Blythin*
             Shpetim Ademi (Wis. SBN 1026973)
             John D. Blythin (Ill. SBN 6281648)
             3620 East Layton Avenue
             Cudahy, Wisconsin 53110
             Tel: 414-482-8000
             Fax: 414-482-8001
             Email: jblythin@ademilaw.com

             *Attorneys for Plaintiff*


**OF COUNSEL:**

**ADEMI LLP**
Guri Ademi
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: gademi@ademilaw.com


*Attorneys for Plaintiff*